UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x

MURASHEA BOVELL

                                    Plaintiff,                                    Index No:

                                                                                  **COMPLAINT**

                    - against –

CITY OF MOUNT VERNON, New York, GLENN
SCOTT, individually and in his official capacity as Police
Commissioner of the Mount Vernon Police Department,
SHAWN HARRIS, individually and in his official
capacity as former Police Commissioner of the Mount
Vernon Police Department, RICHTON ZIADIE,
individually and in his official capacity as Chief of Mount
Vernon Police Department, GREGORY ADDISON,
individually and in his official capacity within the Mount
Vernon Police Department, MICHAEL KUSHNIR,
individually and in his official capacity within the Mount
Vernon Police Department, ANGELES CHEUNG,
individually and in her official capacity within the Mount
Vernon Police Department, GARY ISHKANIAN,
individually, and in his official capacity within the Mount
Vernon Police Department.

                    Defendants.
--------------------------------------------------------------------x

        Plaintiff MURASHEA BOVELL ("Plaintiff" or "Bovell"), by his attorney, Joseph W.

Murray, Esq., as and for his complaint in this action alleges as follows:


                        NATURE OF THE ACTION

        1.        This action concerns the illegal actions of the defendants, primarily members of the

Mount Vernon Police Department ("MVPD") who have engaged in racial discrimination against

Plaintiff, as well as other illegal acts and retaliation against Plaintiff for Plaintiff's continued

reporting and exposing of police corruption, police misconduct, racial discrimination, and other

threats to public safety, primarily impacting members of the Black community of the City of Mount

Vernon ("City") by members of the Mount Vernon Police Department ("MVPD"). As such, Plaintiff seeks compensatory and punitive damages, injunctive and declaratory relief, as well as attorney's fees, proximately resulting from defendant's unlawful conduct, acting individually and in concert with one another, perpetuating an atmosphere within the MVPD accepting of racial discrimination, accepting of police corruption/misconduct, and accepting of retaliation against Plaintiff.

## JURY TRIAL DEMAND

2.      Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## JURISDICTION AND VENUE

3.      Jurisdiction is founded upon 28 U.S.C. § 1331 in that Plaintiff alleges claims which arise under the laws of the United States; 28 U.S.C. § 1343(1) in that Plaintiff seeks to recover damages from the deprivation of Plaintiff's civil rights in the furtherance of defendants' conspiracy pursuant to 42 U.S.C. § 1985(3); 28 U.S.C. § 1343(2) in that Plaintiff seeks to recover damages from defendants who failed to prevent or failed to aid in preventing damages caused by defendants conspiracy pursuant to 42 U.S.C. § 1985(3), that defendants had knowledge of and the power to prevent; 28 U.S.C. § 1343(3) in that Plaintiff seeks to recover damages from defendants to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; 28

U.S.C. § 1367 in that Plaintiff invokes the supplemental jurisdiction of this Court to adjudicate pendant state law claims.

4.      Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred therein.

<u>PLAINTIFF'S PRIOR EMPLOYMENT DISCRIMINATION LAWSUIT</u>

5.      On July 30, 2014, Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and the New York State Division of Human Rights ("NYS-DHR"), alleging racial discrimination and retaliation against MVPD and individual members of MVPD.

6.      Upon information and belief, the United States Department of Justice, Civil Rights Division issued a notice of the right to institute a lawsuit letter to Plaintiff, dated August 17, 2015.

7.      On or about November 2, 2015, Plaintiff commenced a lawsuit (Case No: 7:15-cv-08594(CS) in the S.D.N.Y), against City of Mount Vernon, New York; Commissioner Terrance Reynor, Deputy Commissioner Richard Burke, Captain Michael Goldman, Sergeant Robert Wuttke, and Lieutenant Paul Nawrocki, each in their individual and official capacities ("2015-Lawsuit").

8.      Plaintiff alleged seven claims, including, (1) as against the City for racial discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964; (2) as against the individual defendants for retaliation pursuant to Title VII of the Civil Rights Act of 1964; (3) as against the individually named defendants pursuant to the Equal Protection Clause of the

Fourteenth Amendment to the United States Constitution, by way of 42 U.S.C. §1983; (4)  as

against the City pursuant to a *Monell* claim for the violation of Equal Protection Clause of the

Fourteenth Amendment to the United States Constitution, by way of 42 U.S.C. §1983; (5) as

against the individual defendants for discrimination pursuant to New York State Executive Law

§296; (6) as against the individual defendants for retaliation pursuant to New York State

Executive Law §296; and, (7) as against the City for the discriminatory and retaliatory acts of the

individual defendants pursuant to New York State Executive Law §296, under a theory of

*respondeat superior.*

 9. Upon information and belief, Defendants Raynor and Burke were never served,

therefore the Court did not have jurisdiction over those defendants in that matter.

 10. Moreover, all seven of Plaintiff's claims, with the exception of part of his first

claim were dismissed pursuant to defendants' Motion for Summary Judgment (Rule 56), as

indicated within the transcript of the decision by the Honorable Cathy Seibert. (See, transcript of

decision at Doc-66, p. 63).

> To summarize, the motion for summary judgment is granted as to the
> Title VII discrimination claims against the City, the retaliation claim
> under Title VII against the individual defendants, the equal protection
> claims under 1983 against the individual defendants, and the race
> discrimination and retaliation claims under the Human Rights Law
> against the individual defendants and the City.   That's part of Count
> One and then Counts Two, Three, Four, Five, Six and Seven. *Id.*

 11. With nearly all of Plaintiff's claims dismissed right before trial it was unlikely

that Plaintiff could prevail even on the patrial claim that survived summary judgment, which the

Court aptly pointed out.

> The motion for summary judgment is denied with respect to Plaintiff's
> claim for retaliation under Title VII against the City for the alleged
> harassment by DMA, which is part of Count One.   It sounds like that's

going to be an uphill battle for Plaintiff to prove at trial, but I can't say as a matter of law that it can't be proven. *Id.*

12.     While Plaintiff's many critics, including elected officials of City government, members of the MVPD, and former Westchester County District Attorney, Anthony Scarpino, ignored the very serious problems of racial discrimination and police misconduct alleged in Plaintiff's initial lawsuit, Judge Seibert did not.

It also sounds like there are serious -- or could be serious problems within the Mount Vernon Police Department, but, unfortunately, most of them are not going to be adjudicated in this lawsuit because of lapses in what claims were brought when and against whom.

13.     Plaintiff lost the subsequent trial on the remaining partial claim. Plaintiff's critics have interpreted Plaintiff's loss in the prior lawsuit as license to further discriminate and retaliate against Plaintiff as he continued to speak out against racial discrimination and police corruption, police brutality, and other police misconduct. As such, Plaintiff has suffered even more severe discrimination and retaliation constituting adverse employment actions and creating a hostile work environment.

**Plaintiff initiates related State court action on November 20, 2019**

14.     On November 20, 2019, Plaintiff initiated a related State Court action with the purchase of Index No: 69099/2019, Westchester Supreme Court, and the filing of a Summons and Complaint with exhibits annexed to the complaint.

15.     Plaintiff never served the Summons and Complaint.

16.     Plaintiff never filed a Request for Judicial Intervention.

17.     Plaintiff decided his claims would be better handled in federal court.

**Plaintiff filed seven subsequent Notices of Claim of ongoing discrimination/retaliation**

18.     Plaintiff was compelled to file seven different Notices of Claim and a subsequent related Charge of Discrimination with the EEOC, leading to the instant lawsuit.

19.     Plaintiff's passion, resolve, and raw courage are what drives Plaintiff to continue to fight the good fight, to clean up his beloved MVPD. It is my honor to stand with him in this heroic effort.

JURISDICTIONAL PREREQUISITES

**Seven Notices of Claim containing new allegations, subsequent to the 2015-Lawsuit**

20.     As stated above, Plaintiff has filed seven Notices of Claims upon the City, containing new allegations, subsequent to the 2015-Lawsuit, including, (1) July 6, 2018, (2) July 24, 2018, (3) January 31, 2019, (4) July 2, 2019, (5) September 6, 2019, (6) August 20, 2020, and (7) November 30, 2020, each within ninety days of the claims contained therein, by delivering a copy of the notice to the person designated by law as a person to whom such claim may be served.

21.     The Notice of Claims were in writing, sworn to by Plaintiff before a notary, and contained the name and address of the Plaintiff.

22.     The Notice of Claims set out the nature of the claim, the time, when and the place where and manner by which the claims arose, and the damages and injuries claimed to have been sustained by Plaintiff.

23.     An Examination of Claims hearing, pursuant to NY CLS Gen Mun § 50-h, for Notices of Claim (1) and (2), was requested by the City and conducted jointly on August 15, 2018.

24.     The City of Mount Vernon has neglected and failed to adjust Notice of Claims (1) and (2) within the statutory time period.

25.     No such Examination of Claims hearing was requested for Notice of Claims (3), (4) and (5), which are deemed waived.

26.     The City of Mount Vernon has neglected and failed to adjust Notice of Claims (3), (4) and (5).

27.     A request for an Examination for Claims hearing was initially communicated through the law firm of Bond, Schoeneck & King, on behalf of the City, for Notice of Claim (6) but due to scheduling, we were never able to confirm a date for the Examination for Claims hearing. Then, on October 20, 2020, I was informed that Bond, Schoeneck & King was no longer handling the hearing. I received no further requests from the City to conduct the hearing with regards to Notice of Claims (6), which is now deemed waived.

28.     On January 13, 2021, I contacted Mount Vernon Corporation Council, Brian Johnson, expressing our desire to file our federal lawsuit and that we were waiting to schedule the hearing, to which Mr. Johnson indicated that he would get back to me. I contacted Mr. Johnson again on January 22, 2021 and received an auto message that Mr. Johnson was out of the office on vacation until January 22, 2018 (noting the error in year). On January 25, 2021, I received an email from Mr. Johnson informing me that he would forward this to Mike Lentini, his legal investigator for scheduling. I responded that same day looking forward to scheduling it. On January 26, I receive an email from Mike Lentini making numerous demands for pre-action discovery, not required in advance of the Examination of Claims hearing, and scheduled the hearing on March 2, 2021, more than thirty days after our initial communication and more than three months from the filing of Notice of Claim (7).

29.     In the abundance of caution, while we have included the facts contained within Notice of Claims (6) & (7) herein, we have not yet asserted any specific causes of actions as to

Notice of Claims (6) & (7), until such time as completing the March 2, 2021 Examination of Claim and attempting to adjust these claims with the City. At such time we will seek leave of Court to amend our complaint to add those claims.

**August 31, 2018 EEOC Charge of Discrimination**

30.     On August 31, 2018, Plaintiff filed a Charge of Discrimination with the EEOC, without the assistance of counsel, bv alleging discrimination based on race, color, disability, and retaliation, also indicating that it is a continuing action. Plaintiff suffered these violations at the hands of the City and numerous named defendants, including some of the same individuals that were named within Plaintiff's first EEOC Charge of Discrimination and related 2015-Lawsuit (Case No: 7:15-cv-08594(CS) in the S.D.N.Y).

31.     It is important to note that Plaintiff alleged various violations of law, acts of discrimination, and retaliation complaints involving new events, subsequent to the termination of the 2015-Lawsuit, pursuant to Title VII of the Civil Rights Act of 1964; the American with Disabilities Act of 1990; and 42 U.S.C. §1983.


**THE PARTIES**

32.     The parties are identified and described herein with respect to the relevant times, incidents, and events, described herein.

33.     Plaintiff Murashea Bovell, is and was at all relevant times a resident of the State of New York, Duchess County, serving as an active duty Police Officer within the MVPD, except for the period cited in this complaint where Plaintiff was unlawfully placed on an involuntary leave of absence.

34.     Defendant City of Mount Vernon ("City"), is a municipal corporation duly incorporated and authorized under the law of the State of New York pursuant to Article X of its Charter. The City of Mount Vernon is authorized under the laws of the state of New York to maintain a police department, the MVPD, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of the police officers.

35.     Defendant, Glenn Scott ("Commissioner Scott"), at relevant times was the Police Commissioner of the MVPD, and pursuant to § 115 of the City Charter is responsible for the supervision, administration and discipline of members of the MVPD.

36.     Defendant, Shawn Harris ("Commissioner Harris"), at relevant times was the Police Commissioner of the MVPD, and pursuant to § 115 of the City Charter is responsible for the supervision, administration and discipline of members of the MVPD.

37.     Defendant, Chief Richton Ziadie ("Chief Ziadie"), at relevant time was an executive officer assigned to the MVPD in the rank of Chief.

38.     Defendant Gregory Addison ("Sgt. Addison"), at relevant times was a supervisor assigned to the MVPD in the rank of Sergeant.

39.     Defendant Michael Kushnir ("Sgt. Kushnir"), at relevant times was a supervisor assigned to the MVPD in the rank of Sergeant.

40.     Defendant Angeles Cheung ("Dr. Cheung"), at relevant times was a psychologist employed by MVPD.

41.     Defendant Doctor Gary Ishkanian ("Dr. Ishkanian"), at relevant times was a doctor employed by MVPD, who performed medical evaluations of officers.

## **RELEVANT NON PARTIES**

42.     Clinton Young ("Mayor Young"), at relevant times was the mayor of the City of Mount Vernon, and pursuant to § 63 of the City.

43.     Terrance Rayner ("Commissioner Rayner"), at relevant times was the Police Commissioner of MVPD.

44.     John W. Roland Jr. ("Chief Roland"), at relevant times was an MVPD executive assigned to the MVPD in the rank of Deputy Chief.

45.     Barbara Duncan ("Chief Duncan"), at relevant times was an MVPD executive assigned to the MVPD in the rank of Chief.

46.     Roy Hastings ("Capt. Hastings"), at relevant times was a supervisor assigned to the MVPD in the rank of Captain.

47.     William Podszus ("Sgt. Podszus"), at relevant times was a supervisor assigned to the MVPD.

48.     Daniel Fischer ("Sgt. Fischer"), at relevant times was a supervisor assigned to the MVPD in the rank of Sergeant.

49.     Sean Fegan ("Sgt. Fegan"), at relevant times was a supervisor assigned to the MVPD in the rank of Sergeant.

50.     Lieutenant John Mangeri ("Lt. Mangeri"), at relevant times was a supervisor assigned to the MVPD in the rank of Lieutenant.

51.     Lieutenant Edward Adinaro ("Lt. Adinaro"), at relevant times was a supervisor assigned to the MVPD in the rank of Lieutenant.

52.     Lieutenant Vincent Manzione ("Lt. Manzione"), at relevant times was a supervisor assigned to the MVPD in the rank of Lieutenant.

53.     Robert Ponzini, at relevant times acted as a hearing officer for an appeal of a "return to work order" pursuant to General Municipal Law § 207(c).

54.     Defendant Michael Goldman ("Capt. Goldman"), at relevant times was a supervisor assigned to the MVPD in the rank of Captain.

55.     Defendant Paul Nawrocki ("Lt. Nawrocki"), at relevant times was a supervisor assigned to the MVPD in the rank of Lieutenant.

56.     Defendant Robert Wuttke ("Sgt. Wuttke"), at relevant times was a supervisor assigned to the MVPD in the rank of Sergeant.

57.     Defendant Detective Camillo Antonini ("Det. Antonini"), at relevant times was a detective assigned to the MVPD.

## NATURE OF THE CASE

58.     Plaintiff has been employed as a Police Officer in the MVPD since June 2007 to this date, totaling almost fourteen years of service. From the very beginning of Plaintiff's career, he was subjected to racist comments, witnessed serious misconduct and abuses by members of the MPVD against the public. Plaintiff performed his sworn duty by reporting misconduct and corruption to proper supervision, including Defendants named herein.

59.     In November of 2015, Plaintiff filed a federal civil rights lawsuit against the MVPD and supervisors employed by the MVPD, alleging retaliation and discrimination against Plaintiff.

The lawsuit was adjudicated in April 2018 in favor of the Defendants for the limited claims the jury were allowed to rule on.

60.     In December of 2017, Plaintiff filed a Confidential Harassment Complaint which included reports of corruption, police brutality and other serious misconduct members of the MVPD had committed. The reports were forwarded to the Mayor and City Council. A second report was sent in January of 2018 after he received no response. The details of these reports provided evidence of criminal activities and other misconduct by MVPD members, that created a clear risk of danger and threat to public safety.

61.     Plaintiff's official complaints and prior lawsuit triggered a campaign of retaliatory efforts by Defendants.

62.     The retaliatory conduct referred to in the instant complaint occurred subsequent to adjudication of the federal suit in April 2018 or while that suit was pending adjudication.

63.     Plaintiff's long history of reporting racial  bias, police misconduct, corruption and police brutality, resulted in the organized retaliatory efforts by Defendants.

64.     Retaliatory actions included, but are not limited to, ongoing harassment, denial of General Municipal Law 207-c benefits, Plaintiff being subjected to multiple unwarranted fitness for duty exams after Plaintiff was injured in the course of duty, continued denial of a promotion to detective, public humiliation by supervisors in front of his peers in the form of a supervisor referring to Defendant as a "rat" in front of many officers, a rubber rat being left by Defendant's locker, denial of necessary therapy/treatment for an injury occurring in the line of duty which extended Plaintiff's pain and suffering, causing additional injury to Plaintiff other knee and knowingly false allegations being spread about Plaintiff engaging in criminal conduct.

65.     Plaintiff and Defendants work in the same facility, making it impossible for Defendant to avoid Defendants, resulting in a Hostile Work Environment.

66.     Defendant Dr. Cheung, on behalf of the MVPD, conducted a bogus psychological exam on Plaintiff and with no reasonable medical basis, produced a report concluding Plaintiff was unfit for duty.

67.     Defendant placed Plaintiff on leave of absence without pay status and caused Plaintiff's firearms license to be revoked, using Dr. Cheung's bogus diagnosis as subterfuge.

68.     Plaintiff appealed the decision which automatically changed his pay status to regular pay, pending a Civil Service Law § 72 hearing. The hearing was never conducted, although by law it should have taken place within 30 days of the appeal. Civil Service Law § 72(1). This denied Plaintiff due process.

69.     Plaintiff was forced to find psychological and medical doctors at his own expense to rebut Dr. Cheung's bogus diagnosis. Plaintiff was also forced to hire an attorney at his own expense.

70.     Plaintiff had his firearm license reinstated by a Westchester County District Court decision.

71.     After this ordeal, Commissioner Harris, immediately renewed his efforts to unlawfully prevent Plaintiff from being reinstated to full pay status. Commissioner Harris wrote an order reinstating Plaintiff to duty, but on the condition, Plaintiff submit personal medical records and other records used by the District Court judge in Plaintiff's firearms license hearing.

72.     Citing the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Plaintiff refused, and Defendant placed Plaintiff on unpaid leave.

73.     Defendants had no legal grounds to place Plaintiff on unpaid leave. It was retaliatory conduct, done maliciously to harass, intimidate, and emotionally injure Plaintiff.

74.     Plaintiff was willing and underwent all medical evaluations requested by MVPD officials. Plaintiff only refused to submit records from Plaintiff's private doctor, as legally protected by HIPAA.

75.     The records were psychological records and Defendants demanded he forward it to a medical doctor, not qualified in psychology.

76.     Pursuant to Civil Service Law § 72(1) "the burden of proving mental or physical unfitness shall be upon the person alleging it. *Id.* Requiring Plaintiff to provide his medical documentation in advance of the Civil Service Law § 72(1) hearing constituted unlawful burden shifting.

77.     Plaintiff has continuously been denied a promotion to detective by Commissioner Harris and his career has been adversely injured.

78.     Defendants slandered Plaintiff by stating to Plaintiff's coworkers that Plaintiff stole money from people Plaintiff arrested and also beat them up. Defendants knew this criminal allegation was false or recklessly stated it, with intent to harm Plaintiff's reputation and career, creating a hostile work environment.

### RELEVANT BACKGROUND FACTS

79.     Plaintiff is a 41 year old, black, male, married sixteen years and father of a eleven year old son, who has served the city of Mount Vernon honorably as a veteran police officer with the Mount Vernon Police Department ("MVPD") since on or around June of 2007 to present.[1]

80.     Plaintiff began his career conducting uniformed patrol on 2008-2009 and was intermittently assigned to the Neighborhood Protect program which was initiated to improve community relations through community policing.

81.     Plaintiff quickly became aware of offensive racist conduct and racial slurs engaged in by various MVPD officers and supervisors as well as other police misconduct like the enforcement of summons quotas by supervisors.

82.     Like all rookie police officers Plaintiff was on probation during his first year on the job, in which he could have been terminated at any time for any reason or no reason.

83.     Therefore, Plaintiff was fearful of speaking up about the offensive racist conduct, racial slurs and other police misconduct that he was observing while on probation.

84.     On December 13, 2008, Plaintiff prepared an "MV-5" [2] report documenting summons quota activity being forced upon him by superior officers.

85.     On January 19, 2009, Plaintiff prepared two MV-5 reports documenting retaliation he suffered for calling out sick, by removing Plaintiff from his assignment in a marked police vehicle assigned to mobile patrol to foot patrol. Incidentally, January 19, 2009 was the national holiday honoring Dr. Martin Luther King Jr.

86.     On February 12, 2009, Plaintiff was further suffering retaliation/discrimination because he was yet again reassigned from mobile patrol in a marked police vehicle to foot patrol.

---

[1] The following is a summary of significant events leading up to the need for the requested relief, but it is not all inclusive and exhaustive of all the events that took place during Plaintiff's career.
[2] An MV-5 report is a form in which officers document incidents that is communicated internally through the Mount Vernon Police Department.

87.     By this time, it was quite clear that Sgt. Podszus, a known racist, was targeting Plaintiff with bogus allegations merely because Plaintiff was black and that Plaintiff was not easily intimidated by his abusive supervision, like other officers were.

88.     As such, on February 15, 2009, Sgt. Podszus falsely accused Plaintiff of running two red lights while responding to a location.

89.     Plaintiff denied this allegation and Sgt. Podszus responded by saying, "you people have a problem with authority" and then ordered Plaintiff back to the command to prepare an MV-5 explaining why Plaintiff ran those two red lights.

90.     Plaintiff denied running the red lights in the MV-5 report, but did not include Sgt. Podszus' racist remark because he was standing right over Plaintiff as he was writing the MV-5 and Plaintiff feared further retaliation from Sgt. Podszus if Plaintiff included that in the report.

91.     Instead, Plaintiff prepared a Confidential Harassment Complaint Form detailing all of the facts of this incident, including Sgt. Podszus' racist remarks in quotes, which he submitted to Human Resources on February 16, 2009.

92.     MVPD did not respond to Plaintiff's February 16, 2009 Confidential Harassment Complaint Form until March 6, 2009, when Deputy Chief John W. Roland Jr., ("Chief Roland") called Plaintiff into his office and admonished Plaintiff in a very threatening manner condemning Plaintiff for filing complaints.

93.     Plaintiff recalls Chief Roland even threatening to fire Plaintiff.

94.     Plaintiff received two letters from Chief Roland on or about March 7, 2009, which were dated March 6, 2009.

95.     The first letter was apparently in response to a supervisor's complaint against Plaintiff and in which Chief Roland concurred with the supervisor's findings regarding the

allegation of Plaintiff's improper response to a radio job and recommended a command discipline be administered in the form of forfeiture of sixteen hours time.

96. Chief Roland also admonished Plaintiff regarding the MVPD chronic sick policy and designated Plaintiff to be "chronic sick."

97. The second letter Plaintiff received from Chief Roland dated March 6, 2009 was apparently in response to Plaintiff's complaint.

98. In that letter, Chief Roland demanded that Plaintiff forward the documentation for the incidents Plaintiff alleged so that a proper investigation can be conducted.

99. Soon after Plaintiff's meeting with Chief Roland, Sgt. Podszus physically assaulted and falsely arrested a black disabled retired MVPD detective, Leary Johnson ("Johnson").

100. Johnson became disabled when he and his partner Leroy Palmer were both shot by a suspect that these officers were attempting to question.

101. Johnson was shot in the head. See New York Times article dated November 2, 1993 at https://www.nytimes.com/1993/11/02/nyregion/arraignment-in-shootings-of-2-officers.html.

102. After the incident, Plaintiff was present when Sgt. Podszus directed several officers to change the facts that they included in their reports altering the events in a light more favorable to Sgt. Podszus.

103. In light of the racial discrimination that Plaintiff was suffering from Sgt. Podszus, the retaliation he was suffering from Chief Roland, and now witnessing the corrupt actions of Sgt. Podszus directing subordinate officers to alter the facts in their reports to protect Sgt. Podszus, Plaintiff immediately went over to Mayor Clinton Young's office and requested to meet with the Mayor.

104.    Within five minutes, Plaintiff was invited into the Mayor's office and discussed these complaints with the Mayor.

105.    Within approximately five minutes after leaving Mayor Young's office Plaintiff received a phone call from Mayor Young who informed Plaintiff that he had already spoken to Chief Barbara Duncan ("Chief Duncan") and that she would be investigating Plaintiff's complaints.

106.    Upon information and belief, Chief Duncan (MVPD's first woman chief) was directed by Mayor Young to clean up and restore the integrity of the MVPD.

107.    On March 11, 2009, Plaintiff met with Chief Duncan for approximately two hours in which Plaintiff explained various issues including racial bias and other abusive supervision, including the racist remark made by Sgt. Podszus "You people have a problem with authority" and the bogus improper response to a radio call allegation and alleged chronic sickness.

108.    Plaintiff documented his meeting with Chief Duncan in an MV-5 dated March 11, 2009.

109.    Thereafter, Chief Duncan requested Plaintiff to document the racist remark made to him by Sgt. Podszus in an MV-5, which Plaintiff did on March 26, 2009.

110.    As a result of Plaintiff's meeting with Chief Duncan Plaintiff was not designated "chronic sick" nor was Plaintiff required to forfeit any time for the bogus improper response to a radio call allegation.

111.    Additionally, Sgt. Podszus and Lt. Mangeri who was also party to the harassment imposed on Plaintiff by Sgt. Podszus, were both transferred out of Plaintiff's squad, as Plaintiff requested in his Confidential Harassment Complaint Form dated February 16, 2009.

112.     Finally, Plaintiff felt vindicated and free to return his focus to actively policing within the community.

113.     Plaintiff was approached by MVPD Detective Camelo Antonini ("Det. Antonini") who was a member of the MVPD Narcotics Unit.

114.     The Narcotics Unit lead by Sgt. Daniel Fischer was under scrutiny from Chief Duncan and in danger of being disbanded because of the Narcotics Unit's widely held reputation for engaging in corruption, brutality and racial bias.

115.     At that time, the MVPD Narcotics Unit did not have any black officers assigned to it.

116.     Upon information and belief, Det. Antonini reached out to Plaintiff to invite him into the Narcotics Unit because they were aware how Chief Duncan interceded on Plaintiff's behalf and that with Plaintiff (a black police officer) now part of the Narcotics Unit, they would gain favor with Chief Duncan and be saved from being disbanded.

117.     Plaintiff, a very active police officer with his own confidential informants was interested in joining the Narcotics Unit, but in light of the terrible reputation of the Narcotics Unit, Plaintiff declined the offer.

118.     In response to Plaintiff's declination, Plaintiff was summoned to a meeting with Sgt. Fischer, Lt. Adinaro (phonetic spelling) and a few other high ranking officers who wanted to know why Plaintiff declined the invitation to join the Narcotics Unit and asked Plaintiff to reconsider because if he turned down the offer he would never be offered this opportunity again.

119.     Plaintiff affirmed his declination of their offer.

120.     Soon thereafter, Det. Antonini was placed on modified assignment because of several troubling allegations.

121.    Det. Antonini, had a reputation for being very "heavy handed."[3] Det. Antonini transferred over to MVPD from the NYPD where upon information and belief, Det. Antonini had prior allegations of misconduct against him in the NYPD.

122.    Plaintiff continued working diligently and was certified as a Field Training Officer.

123.    Plaintiff also continued making good arrests with his partners including this arrest from February of 2010. *See United States v. Thornhill*, 34 F. Supp. 3d 334 (S.D.N.Y. 2014).

124.    At or around this time, Chief Duncan disbanded the MVPD Narcotics Unit due to numerous and continuous allegations of corruption, excessive force and other police misconduct allegedly committed by members of the Unit.

125.    Thereafter Chief Duncan relaunched the MVPD Narcotics Unit under the leadership of Sgt. Vincent Stefano and a new unit of police officers, including several black officers.

126.    Plaintiff was again invited to join the new MVPD Narcotics Unit and this time Plaintiff happily accepted the offer.

127.    In 2010, a white police officer, Richard Capraro, who had less than eleven months assigned in an investigative capacity[4], whose performance was less than spectacular and whose police tactics created safety issues for other members of the Narcotics Unit, was promoted to detective.

128.    Plaintiff believed that this promotion to detective was unwarranted and voiced his disapproval.

---

[3] "[H]eavy-handed" is a term of art in the police community as an officer who regularly engages in excessive force.
[4] Civil Service Law § 59a which essentially requires that any officer serving in an investigative capacity for a period of at least eighteen months shall receive a permanent appointment to detective.

129.    In or around December of 2010, Plaintiff was kicked out of the narcotics Unit by Lt. Manzione who was the head of the MVPD Detective Unit allegedly because of Plaintiff's complaints about officer Capraro's promotion to detective.

130.    It should be noted that Chief Duncan had left the MVPD just before Plaintiff was kicked out of the unit.

131.    In or around 2011, Plaintiff rejoined the Narcotics Unit under the supervision of Anthony Mitchel, a black sergeant who believed that Plaintiff was an active cop and kicked out of the unit unjustly.

132.    Sgt. Mitchel suffered an injury and was replaced by Anthony McEachin another black sergeant who praised Plaintiff for his activity and other performance criteria.

133.    Around the same time Det. Antonini was restored to full duty and also reassigned back to the Narcotics Unit.

134.    In or around 2013, Sgt. Sean Fegan, who previously worked under Sgt. Fischer as a detective with Det. Antonini in the old Narcotics Unit, took over the Narcotics Unit.

135.    Unfortunately, during the course of Plaintiff's time working in the Narcotics Unit under Sgt. Fegan, Plaintiff became aware of and also personally witnessed Det. Antonini, under the supervision of Sgt. Fegan, take money, engage in police brutality against members of the black community, falsify police reports, allow certain drug dealers to continue to sell drugs and to keep their profits while they entrapped numerous buyers so as to increase the number of arrests that they were making.

136.    While assigned to the narcotics unit, Plaintiff began recording evidence of corruption, police brutality and racist acts. Plaintiff also began speaking out against these blatant abuses committed by these officers, which caused a lot of friction for Plaintiff.

137.    Plaintiff believed that if he continued working in the Narcotics Unit that his life may be in danger from the most corrupt cops in the Narcotics Unit who realized that Plaintiff presented a danger to them.[5]

138.    As such, in December of 2013, Plaintiff voluntarily left the Narcotics Unit and returned to uniform patrol as a Field Training Officer. This is when the retaliation began to increase from his fellow officers and the administration.

139.    Sergeant Robert Wuttke ("Sgt. Wuttke") who previously worked in Narcotics under Sgt. Fegan, was promoted and then demoted, upon information and belief, because of acts of racial bias and other misconduct.

140.    Wuttke was again promoted and was assigned to uniform patrol.

141.    In March of 2014, Wuttke approached Plaintiff and informed him that Wuttke was directed to write Plaintiff up for calling out sick three times in 2014, but Wuttke noted that Plaintiff had not gone out sick in the previous two years.

142.    On March 29, 2014, Plaintiff prepared an MV-5 to document events that prove Plaintiff was being targeted.   On March 31, 2014, Plaintiff sent an email to Capt. Goldman, Capt. Roy Hastings, Police Commissioner Rayner, and other members of MVPD complaining that he was being unjustly targeted and attached the above referenced MV-5.

---

[5] While the overwhelming majority of police officers are honorable hardworking and dedicated public servants, there are a minority of police officers who engage in criminal activity, racist acts and other police misconduct. Upon information and belief, although most police officers conduct themselves with the highest level of professionalism and integrity, police culture still prevents these honest police officers from reporting corruption pursuant to what is referred to as the "blue wall of silence." Within today's police culture it is acceptable and, in fact, expected that police officers will maintain a high level of integrity, yet reporting corruption is still something that is taboo and looked upon in the police community as being a "rat." Nobody wants to work with a rat and no supervisor wants any rats in his/her unit. Rats are to be shunned as outcasts and are frequently subject to retaliation, as Plaintiff was and continues to be subjected to.

143.   Although Sgt. Wuttke was not Plaintiff's regular supervisor and Plaintiff only interacted with Sgt. Wuttke a few days per month, Sgt. Wuttke was assigned to do Plaintiff's performance evaluation.

144.   Moreover, although the evaluation period was from April 1, 2013 to March 31, 2014, Plaintiff was only reassigned back to patrol on January 1, 2014.

145.   This means that his evaluation was only based upon Plaintiff's performance from January 1, 2014 to March 31, 2014 (3 months).

146.   Within this evaluation Sgt. Wuttke inaccurately reported that Plaintiff had only made one arrest and written zero summonses.

147.   Sgt. Wuttke used these bogus numbers to justify the unfavorable performance evaluation he gave to Plaintiff, despite the fact that Sgt. Wuttke knew full well that those arrest and summons numbers were not reflective of Plaintiff's true performance or representative of his activity throughout the rating period.

148.   Plaintiff is certain that this was done maliciously to further harass and retaliate against Plaintiff because Sgt. Wuttke knew full well that Plaintiff was a very active police officer with exceptional arrests that were self-generated observation arrests, not just responses to radio calls.

149.   In light of this false and misleading evaluation Sgt. Wuttke prepared, Plaintiff filed a complaint with the EEOC complaining that he received an unfavorable performance evaluation as an act of racial discrimination against Plaintiff.

150.   On September 9, 2014 Plaintiff fell in the course of making an arrest and injured his right knee, right shoulder and right hand. As a result of this line of duty injury Plaintiff received benefits pursuant to General Municipal Law § 207(c).

151.     In or around November of 2014, Plaintiff attended to mediation for his EEOC, complaint in which Plaintiff made claims, including, but not limited to that he was denied promotion to detective despite having well over eighteen months in an investigative capacity, (see Footnote 4 above regarding Civil Service Law § 59a) and that he received unfavorable performance evaluation from Sgt. Wuttke.

152.     Sgt. Wuttke reviewed Plaintiff's performance criteria and discovered that Plaintiff had exceptionally high arrest activity which were self-initiated and not a result of radio calls.

153.     As such, Sgt. Wuttke apologized for giving Plaintiff the inaccurate and unfavorable evaluation and issued an amended performance evaluation for the rating period noting that Plaintiff actually made thirty arrests during the period, instead of the one arrest that Sgt. Wuttke noted in the evaluation.

154.     The mediation did not resolve Plaintiff's complaint that he was wrongfully denied promotion to detective, so Plaintiff proceeded with that complaint.

155.     This angered Capt.Goldman and Lt. Nawrocki who assigned Plaintiff's case to a disability management outside agency, for the purpose of, upon information and belief, monitoring Plaintiff's medical treatment and progress throughout his recovery.

156.     In reality, they were hired to harass Plaintiff into returning to duty as quickly as possible, regardless of Plaintiff's medical needs.

157.     In 2015, Plaintiff's medical treatment for the September 9, 2014 work related injury was stopped prematurely by Defendants, while Plaintiff was still in need of additional surgery and follow-up care.

158.    Throughout Plaintiff's medical treatment, members of the MVPD Internal Affairs Unit repeatedly visited Plaintiff at his home, banging on his door instead of using his doorbell, causing annoyance and alarm to Plaintiff and his family.

159.    These officers called him out of his home into their police vehicles compelling him to sign documents, consenting to the release of his private medical records.

160.    In November of 2015, Plaintiff filed a federal civil rights lawsuit against City of Mount Vernon and others.

161.    Plaintiff litigated his case until April 2018, in which a jury returned a defense verdict on the limited claims that they were allowed to consider.

162.    In December of 2017 Plaintiff filed a Confidential Harassment Complaint Report with Human Resources detailing the harassment he was suffering during his medical treatment.

163.    Additionally, Plaintiff included reports of very serious police corruption, racist and sexist conduct of members of the service and forwarded it to the Mayor and City Council members.

164.    Plaintiff received no response to his complaint, so he resubmitted the same complaint to the new council members and the comptroller on January 2, 2018.

165.    Again, Plaintiff received no response to his complaint except from Councilman Andre Wallace and Council President Roberta Apuzzo, who both contacted Plaintiff and informed him that they believe that the allegations within Plaintiff's complaint were true and accurate.

166.    As a result of the September 9, 2014, injury which occurred in the line of duty, Plaintiff was given General Municipal Law 207(c) status from the date of that injury and remained home with pay as allowed by law.

167.     Plaintiff underwent three surgeries on his right knee on the following dates: 11/10/2014, 5/7/2015 and 11/18/2016. In April of 2017, Plaintiff was ordered back to work light duty, but appealed that decision and remained home with pay.

168.     The hearing for that appeal was held in January of 2018.

169.     The City acknowledged in their brief, dated March 19, 2018, that they received medical records from Plaintiff's doctor stating the injury to his right knee caused a compensation injury to his left knee.

170.     The City contends in the brief that the only evidence of the left knee injury is the Plaintiff's doctor's medical evaluation.

171.     Plaintiff contends that the medical opinion of the doctor who has been treating his knee condition is the best evidence and is mystified as to what further evidence would demonstrate that undergoing three surgeries on one knee can cause the other knee to be injured by the body's compensation.

172.     On April 11, 2018, Plaintiff called the police department and advised that he was leaving his residence to go to the doctor and then go to the police department to renew his police identification card because his current police identification card had just expired.

173.     Upon Plaintiff's arrival to the police department, Plaintiff was granted entrance to the police department by Sgt. Gregory Addison.

174.     Plaintiff informed Sgt. Addison that he was there to renew his police identification card.

175.     Plaintiff went upstairs to get his new identification card.

176.     Thereafter, Sgt. Addison yelled over to Plaintiff in a demeaning and condescending way, in front of several of Plaintiff's colleagues and told Plaintiff to approach him.

177.    Once Plaintiff approached him, Sgt. Addison admonished Plaintiff that he was not allowed to be inside the police facility while he was out sick and then further humiliated Plaintiff by escorting him to the door compelling Plaintiff to leave without first having renewed his police identification card.

178.    Plaintiff documented this in subsequent complaints and emails.

179.    By letter dated April 16, 2018, Plaintiff was instructed that he must report for two fitness for duty examinations (orthopedic and psychological) before he may return to work.

180.    Plaintiff attended both Fitness for Duty examinations. Plaintiff was scheduled to see Dr. Angeles Cheung, PhD., to conduct the psychological Fitness For Duty examination on April 24, 2018 at 9:00 am.

181.    Plaintiff arrived on time, but Dr. Cheung was one and one-half hours late. Plaintiff was cooperative and answered all of Dr. Cheung's questions.

182.    Upon answering all of her questions, Dr. Cheung instructed Plaintiff that he can leave and that she will prepare her report.

183.    On April 25, 2018, Plaintiff also timely reported for his orthopedic examination.

184.    Plaintiff made other complaints regarding his being kicked out of the precinct, being sent for unnecessary Fitness For Duty tests, and that he has not received the results of the Fitness For Duty examinations.

185.    On June 1, 2018, Plaintiff received the decision on his General Municipal Law § 207(c) appeal hearing, which determined that Plaintiff is no longer eligible to receive 207(c) benefits.

186.    It should be noted the hearing officer the MVPD selected was Robert Ponzini, an attorney disbarred from practicing law in 1999 for mismanaging a client's funds. *See*, Elsa

Brenner, *In Brief; Lawyers Disbarred*, The New York Times, August 29, 1999, https://www.nytimes.com/1999/08/29/nyregion/in-brief-lawyers-disbarred.html.

187.    Upon information and belief, Mr. Ponzini has a reputation for siding with the City in hearings that he administers, so he is used often in this capacity. Here, Mr. Ponzini abused the latitude given in 207(c) hearings and failed to consider evidence of the additional injury a dedicated officer who underwent three surgeries on the same knee sustained.

188.    By letter dated June 25, 2018, Plaintiff is informed by Police Commissioner Shawn Harris that Plaintiff was deemed psychologically unfit for duty by Dr. Cheung and that Plaintiff was being placed on involuntary unpaid leave of absence, without pay, effective immediately.

189.    It should be noted that Dr. Cheung's report, dated May 1, 2018, indicates that "[h]e would likely do tremendous harm to himself and to others if returned to his previous job as a police officer." *Id*.

190.    Yet, the police commissioner was apparently not concerned to do anything about this alleged emergent condition until drafting his letter, dated June 25, 2018, nearly two months later.

191.    This demonstrates the bogus nature of this report.

192.    A review of Dr. Cheung's report revealed Dr. Cheung used Plaintiff's feelings of distrust, harassment and emotional harm from Defendants, as a basis for classifying Plaintiff's feelings as paranoid.

193.    Apparently, Dr. Cheung did not believe it was possible for Defendants to retaliate, harass and emotionally harm Plaintiff or give Plaintiff a legitimate reason to distrust Defendants.

194.    Plaintiff served a letter dated July 5, 2018, via certified mail, to police commissioner Shawn Harris, requesting a hearing to appeal the unfit for duty leave of absence without pay designation, pursuant to Civil Service Law § 72.

195.    The Civil Service Law § 72 appeal hearing was never granted.

196.    Plaintiff is served with an Order to Show Cause dated July 20, 2018, requesting among other things, that Plaintiff's pistol permit be suspended, and Plaintiff surrender his firearms.

197.    Plaintiff retained counsel at his own expense and submitted his own medical evidence disputing the bogus report proffered by the MVPD.

198.    By Decision and Order dated January 10, 2019, the Honorable Fufidio, J held that, "no good cause exists for the revocation of respondent's pistol permit." Judge Fufidio further ordered that "Respondent's pistol license, firearms, rifles, or shotguns that are now in the possession of the Dutchess County Sheriff's Office be returned to him [Plaintiff] upon presentation of a copy of this Order." See, Judge Fufidio's Decision and Order dated January 10, 2019.

199.    Plaintiff submitted a third Notice of Claim to the City of Mount Vernon and the named individuals, dated January 31, 2019, via certified return receipt requested.

200.    By letter dated March 12, 2019, Police Commissioner Shawn Harris determined that in light of the court's determination that Plaintiff was fit for duty to possess a firearm, that Plaintiff was eligible to return in the light duty position, but falsely alleged that Plaintiff had failed to return to duty since the final determination of the police commissioner on June 12, 2018.

201.    The letter further stated Plaintiff was to submit all his medical records to Dr. Ishkanian. Dr. Ishkanian is a medical doctor.

202.    Plaintiff had been directed not to come back to work as a result of a psychological report prepared by Dr. Cheung declaring him unfit for duty.

203.    This raised a HIPAA concern for the Plaintiff.

204.    Plaintiff sent a letter to Police Commissioner Harris and Lt. Nawrocki dated March 20, 2019 indicating his intention to comply with their demand for medical records in the forum he was legally entitled to: a Civil Service Law § 72 appeal hearing. Plaintiff also advised that he was represented by counsel and provided them with his counsel's contact information.

205.    Plaintiff received a letter dated April 4, 2019, indicating that since Plaintiff failed to provide the requested medical documentation by the March 22, 2019 deadline that it was determined effective immediately that Plaintiff was deemed to be absent without leave, which is an unpaid status.

206.    Plaintiff, under financial duress from not getting paid submitted all his medical records on May 3, 2019.

207.    On May 28, 2019, Plaintiff was restored to light duty. After four and a half years, three painful knee surgeries, other injuries associated with that line of duty injury and tremendous stress caused by Defendants' retaliatory actions, Plaintiff returned to light duty.

208.    Defendants wrongfully terminated necessary treatment for Plaintiff's knee injuries.

209.    This has extended the period of healing and led to further injury, pain and suffering. Defendant's personal health insurance does not cover this therapy, because it is a Workman's Compensation case.

210.    Defendant has provided medical documentation and made numerous requests to Lt. Nawrocki, Chief Zaidie, and Dr. Ishkanian and has been refused or ignored.

211.    This is outrageous conduct, done recklessly or negligently to retaliate against the Plaintiff.

212.    On July 15, 2019, Plaintiff reported to work and upon arriving at his locker observed a rubber rat on the floor nearby.

213.    Sgt. Addison then appeared from a nearby entrance, looked at Plaintiff and began laughing.

214.    No other officers were expected to report for duty at that time.

215.    Plaintiff took a photo of the rubber rat and forwarded it to Chief Ziadie.

216.    On July 16, 2019, Plaintiff arrived at work and observed an unknown white paste had been smeared by an unknown person on the combination lock of his locker.

217.    Plaintiff took a photo of the unknown paste.

218.    July 16, 2019, Chief Ziadie saw Plaintiff and advised him to step into his office, while motioning towards the men's bathroom.

219.    In the bathroom, Plaintiff gave a full account of the rubber rat and paste incidents to Chief Ziadie.

220.    Chief Ziadie did not take the complaint seriously.

221.    Chief Ziadie did not investigate or address the incidents.

222.    Chief Ziadie condoned this conduct which furthered the hostile work environment within MVPD which was clearly retaliatory conduct meant to further harass Plaintiff, place him in fear for reporting misconduct, and furthering racial animus towards Plaintiff.

223.    On August 7, 2019, while addressing Plaintiff and a group of officers at roll call, Sgt. Kushnir stated, "Special attention to 412 South Second [Ave.], there's rats. Not like the rats here at Headquarters."

224.    Sgt. Kushnir then motioned with his head towards Plaintiff and the officers in the room began laughing. Sgt. Kushnir, motioning his head toward Plaintiff again, then continued to say, "It's been so chaotic here even the snitches don't know who they are."

225.    The group of officers erupted in laughter in the presence of the humiliated Plaintiff. This incident was captured on an audio recording by Plaintiff.

226.    A similar incident to the August 7th incident occurred at roll call on August 8th, 2019. Sgt. Kushnir addressed a group of officers regarding conditions they needed to be aware of and stated, "412 Second rats," while motioning towards Plaintiff.

227.    Sgt. Kushnir then further stated, "We already know that story," while again motioning toward Plaintiff. The group laughs as the humiliated Plaintiff stood by quietly.

228.    Both incidents were reported to Chief Ziadie.

229.    Chief Ziadie did not take the complaint seriously.

230.    Chief Ziadie did not investigate or address the incidents.

231.    Chief Ziadie condoned this conduct which furthered the hostile work environment within MVPD which was clearly retaliatory conduct meant to further harass Plaintiff, place him in fear for reporting misconduct, and furthering racial animus towards Plaintiff.

232.    This incident was captured on an audio recording by Plaintiff.

**DEFENDANTS' RETALIATORY AND HOSTILE
WORK ENVIRONMENT ACTIONS**

233.    Defendants' retaliatory actions consists of the following: After Plaintiff was injured by slipping in the course of making a lawful arrest, Defendants with intent to annoy, harass, intimidate and ultimately attempt to terminate Defendant's employment, subjected Defendant to

numerous unnecessary physical and psychological fitness for duty exams and caused Plaintiff's gun license to be revoked.

234.    Defendants further denied Plaintiff necessary medical treatment prescribed by Plaintiff's private doctor, knowing his private insurance would not cover the expense of such treatment, because it had occurred at work and needed to be covered by Workman's Compensation.

235.    The psychological exam conducted by Dr. Cheung on April 24, 2018, contained a bogus finding. Dr. Cheung, on behalf of the MVPD, conducted a psychological exam on Plaintiff and with no legitimate medical or psychological basis, concluded Plaintiff was unfit for duty, citing he was a danger to himself or others, as well as paranoid.

236.    A part of the basis of this conclusion was Plaintiff's distrust and resentment of Defendants.

237.    In reality, Defendants are "out to get" Plaintiff as retaliation for his reporting corruption and misconduct.

238.    Commissioner Harris placed Plaintiff on leave of absence without pay status and had Plaintiff's firearms removed on June 25, 2018.

239.    Commissioner Harris also wrongfully and maliciously caused Plaintiff's gun license to be revoked by reporting Plaintiff's "mental issues" to the County.

240.    The delay between Dr. Cheung's April 24th, 2018 report and the removal of Plaintiff's firearms, demonstrates Defendants knew Plaintiff was not a danger to anyone.

241.    Plaintiff appealed this decision and was reverted to regular pay status pending the appeal, but was not allowed to return to work by Commissioner Harris. He remained home on paid leave until May 2019.

242.    Plaintiff was forced to find psychological and medical doctors at his own expense to rebut Dr. Cheung's bogus diagnosis. Plaintiff was also forced to hire an attorney at his own expense.

243.    On January 10, 2019, a Westchester County District Court found Plaintiff was mentally fit to carry gun and ordered Plaintiff's license restored.

244.    On March 12, 2019, Commissioner Harris sent a letter to Plaintiff, citing the District Court's gun license decision and finding he too no longer thought Plaintiff was a danger to himself or others.

245.    Commissioner Harris advised Plaintiff he could come back to work, but his that failure to submit all medical records of the January 10, 2019 gun license hearing would result in a delay of Plaintiff's return to duty.

246.    Citing the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Plaintiff refused to submit his medical records.

247.    Commissioner Harris was unlawfully imposing burden shifting upon Plaintiff by requiring him to provide his medical evidence first.

248.    Since Plaintiff refused that unlawful order, on April 4, 2019, Plaintiff received a letter stating he was being placed on unpaid leave.

249.    Commissioner Harris and MVPD had no legal grounds to place Plaintiff on unpaid leave, but did so to harass, intimidate, and further emotionally injure Plaintiff through perpetuating a hostil work environment.

250.    The unpaid leave order immediately jeopardized Plaintiff's opportunity for promotion.

251. On April 16, 2019, he received a letter from the Municipal Service Commission that he was declared ineligible to take the Sergeant exam, due to his status no longer being an active officer.

252. This created more pressure for Plaintiff to acquiesce to Defendants' demands.

253. On or about April 19, 2019, during a phone call, Chief Ziadie, informed Plaintiff that he would have been promoted to detective earlier in his career, but Commissioner Harris held his promotion back, because Commissioner Harris took things personal.

254. In late March of 2019, Commissioner Harris had been fired by Mayor Thomas, so personnel spoke freely.

255. Plaintiff worked in an investigatory assignment from 2010 through 2013 which pursuant to New York Civil Service Law § 58(4)(c)(ii), entitled Plaintiff to a promotion to detective.

256. On or about, April 15, 2018, Plaintiff became aware that Sgt. Wuttke, Det. Antonini and Sgt. Fegan, stated to PO Campo and other people in the MVPD, in sum and substance, Plaintiff physically assaulted and stole money from people Plaintiff arrested in the past.

257. PO Campo informed Plaintiff and stated there were other officers present.

258. Defendants knew these allegations were false.

259. Plaintiff has filed numerous complaints, been involved in the aforementioned labor disagreements, filed a federal lawsuit and Equal Employment Opportunity Commission Complaint.

260. Plaintiff has been called a rat in front of his peers on two occasions and a rubber rat was left by his locker, in retaliation for his whistleblowing activities.

261.     Plaintiff is a sworn member of the MVPD and has consistently paid all required Union dues entitling him to Union assistance and representation in disputes with management.

262.     Defendants failed to provide legal representation in the General Municipal Law § 207-c hearing and didn't aid Plaintiff when Commissioner Harris refused to grant Plaintiff a Civil Service § 72 hearing. Plaintiff hired attorneys at his own expense, after the Union's refusal to assist him.

263.     Defendants ignored requests made by Plaintiff, directly to Union President, Brent Gamble and other Union employees, to assist in disputes regarding improper deduction of sick days, revocation of his firearms license and other disputes with MVPD. The Union's failure is continuous and ongoing.

## AS AND FOR A FIRST CAUSE OF ACTION

264.     Plaintiff repeats and realleges paragraphs "1" through "263" of the Complaint as fully set forth herein.

265.     Under the theory that the defendant City of Mount Vernon is liable to the plaintiff for racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended by 42 U.S.C. §2000e.

## AS AND FOR A SECOND CAUSE OF ACTION

266.     Plaintiff repeats and realleges paragraphs "1" through "214" of the Complaint as fully set forth herein.

267.    Under the theory that the individually named defendants are liable to the plaintiff for racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §2000e.

## AS AND FOR A THIRD CAUSE OF ACTION

268.    Plaintiff repeats and realleges paragraphs "1" through "217" of the Complaint as fully set forth herein.

269.    Under the theory that the City of Mount Vernon is liable to the plaintiff under *Monell* for violations of his right to Equal Protection under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §1983.

## AS AND FOR A FOURTH CAUSE OF ACTION

270.    Plaintiff repeats and realleges paragraphs "1" through "217" of the Complaint as fully set forth herein.

271.    Under the theory that the City of Mount Vernon is liable to the plaintiff under *Monell* for violations of the Americans With Disabilities Act of 1990, 42 U.S.C. §1983.

## AS AND FOR A FIFTH CAUSE OF ACTION

272.    Plaintiff repeats and realleges paragraphs "1" through "217" of the Complaint as fully set forth herein.

273.    Under the theory that the individually named defendants are liable to the plaintiff for racial discrimination in violation of New York Executive Law §296.

## AS AND FOR A SIXTH CAUSE OF ACTION

274.    Plaintiff repeats and realleges paragraphs "1" through "217" of the Complaint as fully set forth herein.

275.    Under the theory that the individually named defendants are liable to the plaintiff for retaliation in violation of New York Executive Law §296.

## AS AND FOR A SEVENTH CAUSE OF ACTION

276.    Plaintiff repeats and realleges paragraphs "1" through "217" of the Complaint as fully set forth herein.

277.    Under the theory that the City of Mount Vernon is liable to the plaintiff for the discriminatory and retaliatory acts and omissions of the individually named defendants in violation of New York Executive Law §296 under the theory of *respondeat superior*.

## AS AND FOR A EIGHTH CAUSE OF ACTION

278.    Plaintiff repeats and realleges paragraphs "1" through "217" of the Complaint as fully set forth herein.

279.    Under the theory that the City of Mount Vernon is liable to the plaintiff under *Monell* for violations of Plaintiff's First Amendment Right to Free Speech, pursuant to 42 U.S.C. § 1983.

## AS AND FOR A NINTH CAUSE OF ACTION

280.    Plaintiff repeats and realleges paragraphs "1" through "217" of the Complaint as fully set forth herein.

281.    Under the theory that the individual defendants are liable to the Plaintiff for violations of Plaintiff's First Amendment Right to Free Speech, pursuant to 42 U.S.C. § 1983.

## AS AND FOR A TENTH CAUSE OF ACTION

282.    Plaintiff repeats and realleges paragraphs "1" through "217" of the Complaint as fully set forth herein.

283.    Under the theory that the City of Mount Vernon is liable to Plaintiff for violations of the Americans With Disabilities Act of 1990, 42 U.S.C. §1983.

## AS AND FOR A TENTH CAUSE OF ACTION

284.    Plaintiff repeats and realleges paragraphs "1" through "217" of the Complaint as fully set forth herein.

285.    Under the theory that the City of Mount Vernon is liable to Plaintiff for violations of the Americans With Disabilities Act of 1990, 42 U.S.C. §1983.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

286.    Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the paragraphs set forth above, with the same force and effect as if more fully set forth herein.

287.    That each and all of the defendants herein had a duty of care to the Plaintiff; that said duty was breached by the defendants; that said breach resulted directly in emotional harm.

288.   That defendants, through extreme, outrageous, negligent and reckless behavior, caused severe emotional distress, mental trauma, and/or bodily harm to the Plaintiff; that defendants engaged in extreme and outrageous conduct; negligently causing, or negligently disregarding a substantial probability of causing, severe emotional distress; and there lies a causal connection between the conduct and injury; and resulting severe emotional distress.

289.   That Defendants engaged in extreme and outrageous conduct against the Plaintiff, negligently and/or recklessly disregarding the substantial probability of causing, severe emotional distress; there exists a direct causal connection with the conduct of the defendants and the injuries suffered by Plaintiff, including but not limited to Plaintiff's severe emotional distress.

290.   That Defendants' actions go beyond all possible bound of decency and is regarded as atrocious and utterly intolerable in a civilized community.

291.   That the acts of Defendants described herein constitute a negligent infliction of emotional distress against the Plaintiff, and the Plaintiff has suffered damages pursuant thereto, and he will continue to suffer same in the future.

**WHEREFORE**, Plaintiff demands judgment against defendant:

1. For economic damages against all defendants, with statutory interest;

2. For compensatory damages against all defendants as the jury may determine;

3. For punitive damages against all individual defendants as the jury may determine;

4. For costs, disbursements, and reasonable attorneys' fees pursuant to 42 U.S.C. 1988; and,

5. For such other and further relief as the Court deems just and proper.

Dated:  Nassau, New York
        February 23, 2021

By: _____

Joseph W. Murray, Esq.
*Attorney for Plaintiff Murashea Bovell*
185 Great Neck Road, Suite 461
Great Neck, New York 11021
Cell Phone: (718) 514-3855
Office Phone (646) 838-1702
Email: joe@jmurray-law.com